IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| B&B HARDWARE, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | No. 4:06CV01654 SWW |
| | * | |
| HARGIS INDUSTRIES, INC., d/b/a | * | |
| SEALTITE BUILDING FASTENERS, | * | |
| ET AL., | * | |
| | * | |
| Defendant. | * | |

**MEMORANDUM AND ORDER**

Before the Court is the motion of Hargis Industries, Inc. ("Hargis") for attorney's fees to which B&B Hardware, Inc. ("B&B") responded. Hargis filed a reply to the response. For the reasons stated below, the Court finds the motion should be granted but withholds determination of the amount of fees to be awarded.

**Background**

B&B first brought a Lanham Act trademark infringement claim against Hargis in 1998 alleging Hargis' use of the mark "Sealtite" infringed B&B's registered mark, "Sealtight." The case proceeded to trial and ended in a less-than-unanimous jury verdict in favor of Hargis. The judgment was affirmed on appeal. B&B brought suit against Hargis again in December 2006, alleging trademark infringement over Hargis' use of the "Sealtite" mark. Hargis counterclaimed, asserting *inter alia* claims of false advertising and false designation of origin, alleging B&B used photographs of Hargis's products and size and weight charts from Hargis' website on B&B's

new website. A jury returned verdicts in favor of Hargis and against B&B. The Court denied B&B's motion for judgment as a matter of law, or in the alternative, for a new trial.

## Discussion

The Lanham Act gives the Court discretion to award reasonable attorney's fees to a prevailing party in "exceptional cases." 15 U.S.C. §1117(a). An exceptional case is one in which the action was "groundless, unreasonable, vexatious, or pursued in bad faith," or in which a party's conduct "went beyond the pale of acceptable conduct." *Scott Fetzer Co. v. Williamson,* 101 F.3d 549, 555 (8th Cir. 1996); *Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863, 877 (8th Cir. 1994). Hargis argues that B&B knew it had a weak case and engaged in a deliberate effort to manufacture evidence of trademark infringement and likelihood of confusion. Hargis asserts that B&B's deceitful actions were aimed at creating the false appearance of being in the construction fastener business and therefore in competition with Hargis and creating the false appearance of entering into the construction fastener market in an effort to prevail on a reverse confusion theory if the forward confusion theory failed.

Hargis asserts that the evidence showed, and the jury found, that B&B copied both photos of fasteners and size/weight charts from Hargis' website at sealtite.com and displayed them on a new website at sealtightcf.com to portray a purported new line of construction fasteners allegedly being offered by B&B, the same kind of construction fasteners sold by Hargis. Hargis argues that despite overwhelming evidence that B&B did so, co-owners Larry and Diana Bogatz maintained both in their trial and deposition testimony that B&B copied neither the construction fastener images nor any of the other materials from Hargis' website. Furthermore, in his deposition, Larry Bogatz said that the fasteners depicted in the B&B website

constituted fasteners which were designed by him and his wife, Diana, manufactured in accordance with those designs, and then returned to the B&B premises where they were photographed for inclusion in the website by an employee, Ezequiel Rosales.

In direct conflict with this sworn testimony, the sheet of photos produced in discovery by B&B as the photos taken by Rosales, and introduced at trial, show that those photos could not possibly have depicted all of the individual fasteners described on the sealtightcf.com website. In addition, Rosales testified that Larry Bogatz never mentioned anything to him about the photos being intended for inclusion in any website. Visual evidence and expert testimony at trial showed that the fastener images in question were, in large part, copied or "lifted" directly from the fasteners depicted on Hargis' website. Hargis personnel and its website designer, Steve Henderson, testified the fasteners shown on the B&B website were designed by Hargis personnel and photographed by Henderson for inclusion on Hargis' sealtite.com website.

Although email correspondence between Larry Bogatz and B&B's offshore web designer, Sanjiv, introduced at trial demonstrate that Larry Bogatz was intimately involved in the preparation, design, and substance of the B&B website, and that he reviewed and suggested significant, substantive changes to it immediately before and after it went online, Larry Bogatz testified at trial that he did not pay close enough attention to the photos on the website to ascertain from where they came. Throughout his testimony, Larry Bogatz maintained he had no idea where the photos came from despite overwhelming visual evidence and expert testimony that they were the same photos of fasteners (or composite manipulations with respect to some) displayed on Hargis' website. Despite his testimonial admission that it was B&B and not Sanjiv who created the size and weight charts for the sealtightcf.com website, and despite the fact that a

typo appearing on a size/weight chart on Hargis' website also appears on the exact same corresponding chart and line item on the B&B sealtightcf.com site, Larry Bogatz testified at trial that B&B did not copy any size and weight charts from Hargis' site. He gave no plausible explanation at trial as to how the same typo could have occurred absent copying by B&B.

In addition, Hargis asserts that according to uncontroverted testimony at trial, the specimens B&B produced at trial as samples of its purported new construction fastener line could have been obtained easily either at a retail home improvement store or as free samples at a fastener trade show. B&B introduced no evidence that it ever submitted any design drawings to a manufacturer for the actual manufacturing of a construction fastener.

Hargis points out that B&B placed metatags/keywords on the B&B sealtightcf.com website posted online in February approximately four before trial, using Hargis' trademark, "sealtite," and phrases containing that term or variations thereof, in an attempt to cause customers who might be searching for Hargis fasteners via search engines to obtain a high-relevance "hit" on the B&B sealtightcf.com site. Also, B&B registered multiple domain names with "sealtite" in the address in an attempt to divert parties searching for Hargis' site to the contrived B&B construction fastener site.

There was evidence that Larry Bogatz instructed Victor Solano, a B&B employee, to call multiple existing customers of Hargis, identify himself over the telephone as an employee of "Sealtite" or "Sealtight" (phonetically the same), and request "updated" information from Hargis customers, an apparent attempt, according to Hargis, to manufacture confusion as well as to manufacture evidence to support a reverse-confusion theory.

B&B created a document titled a "Common Customer List" with scores of companies listed as customers of both Hargis and B&B, despite Larry Bogatz's eventual admission that the only criteria for a company being considered a customer of B&B was that at some point, B&B had allegedly made contact with the company. Further, with respect to most of the companies listed, B&B could not provide any information to the jury as to the date of any contact, the nature of the contact, or the identity of any person from B&B or the alleged customer with whom contact was made, much less any information as to a single sale or even a request for a quote. B&B later introduced a second document which contained only three or four companies to which B&B alleged that both B&B and Hargis had actually made sales. Only three companies reflected any actual sales by B&B. One company reflected approximately $1,0000.00 in sales by B&B; another less than $400, and the other was Fastenal, to which Hargis' sales have been on average roughly 2/10ths of one percent. B&B presented no evidence of any confusion as to the sources of the goods with respect to either company.

B&B created and introduced into evidence purported design drawings of "construction fasteners" ostensibly for the alleged new line of B&B construction fasteners which, according to the uncontroverted testimony of Hargis designer Tom Hulsey, were machine thread screws, not self-tapping construction fasteners, and so technically flawed that a manufacturer could not possibly manufacture a construction fastener from them. The evidence also showed that B&B created a bogus "business plan" for the supposed new line of construction fasteners which contained no in-depth market analysis, no projected return-on-investment analysis, no cash flow analysis, or any other *pro forma* financial analysis which would provide any reasonable basis for a prospective lender to evaluate the risk of the proposed venture.

5

Mr. Bogatz testified that B&B did not "really focus on" going into the construction fastener business until "about two years ago." This, Hargis argues, would have been some two years after the second trademark suit was filed and entirely inconsistent with the evidence introduced at trial of e-mails between Larry Bogatz and Sanjiv demonstrating unequivocally that B&B's first effort at creating a website for this new construction fastener line was in January 2010, roughly five months before trial.

Hargis also points out that Larry Bogatz testified that Hargis was the sole cause of B&B's alleged loss in sales revenue despite the fact that Bogatz knew B&B had as recently as one month before trial filed a lawsuit against Fastenal, a distributor, seeking hundreds of millions of dollars in damages for lost sales revenue due to Fastenal's alleged breach of contract.

B&B argues in response that it was entirely justified in believing it had a viable trademark infringement case and relied on rulings by the Trademark Trial and Appeal Board ("TTAB") that there was a likelihood of confusion between the two marks and the opinion of its trademark expert that he had never seen such an overwhelming amount of evidence of actual confusion. Thus, B&B asserts its case was not groundless, unreasonable, vexatious, or pursued in bad faith. B&B further disputes that it engaged in a campaign of fraud and deceit in order to prevail in its case.

B&B states that even though the jury believed Hargis' allegations that B&B copied Hargis photographs and size/weight charts from Hargis' website "to some extent," the Court should consider that B&B voluntarily produced a copy of the website to Hargis in discovery, that the site was up for no more than six weeks, and that it made no sales as a result of any use of Hargis' photographs. B&B complains Hargis made a number of speculative allegations

immediately before trial, during the trial, and in its motion for fees. For example, Hargis speculated that there was no Sanjiv and referred to B&B's business plan as "bogus." B&B asserts evidence presented at trial show that it obtained samples of its new construction fasteners from potential manufacturers, and Larry Bogatz testified that because B&B owns the federal trademark for "Sealtight," he believed B&B was able to use variations on the spelling, like "sealtite," on some metatags and keywords on its website. B&B argues that although it registered domain names that had "sealtite" in its address, there was evidence that Hargis also had registered a domain name that had "sealtight" in its address.

  B&B claims the list given to Solano for making phone calls contained many other potential customers in addition to customers of Hargis and that this in no way was an attempt to manufacture confusion. B&B claims that the "Common Customer List" introduced at trial was actually a document created by B&B's attorneys that was provided to B&B in order for B&B to determine what sales had been made to those companies so B&B could produce an accurate list of common customers. B&B says it never contended that the larger list constituted common customers. It also asserts that the design drawings referenced by Hargis were not for machine thread screws but for self-tapping construction fasteners, and that it has many design drawings that contained similar specifications and never had any difficulty getting appropriate fasteners manufactured therefrom. B&B asserts it spent a large amount of time developing its business plan two or three years prior to the trial. Further, B&B argues it spent a substantial amount of time working on design drawings for its new construction fasteners as well as contacting potential manufacturers in the two or three years leading up to trial, and that it makes perfect sense for the design of the website to be one of the last things for B&B to do before launching its

new line.  Finally, B&B disputes that Larry Bogatz testified that Hargis was the sole cause of B&B's alleged loss in sales revenue, and claims any breach of contract by Fastenal should not have affected existing sales.

In reply, Hargis points out that at the time B&B filed its second lawsuit, the TTAB had not issued the ruling relied on in its response, and that B&B's expert was not called as a witness and therefore his opinion was not subjected to cross-examination.  Hargis argues this is an exceptional case not just because B&B's claims were without merit but because the evidence supports its assertions that B&B fraudulently manufactured evidence and engaged in other behavior during the course of the litigation that went "beyond the pale of acceptable conduct."

A number of courts have determined a case to be "exceptional" because of a party's attempt to confuse the public by use of the internet.  In *Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56 (1st Cir. 2008), the First Circuit upheld the district court's award of attorney's fees to the plaintiff where the defendant had included plaintiff's marks as metatags on defendant's website, for the purpose of diverting those looking for plaintiff's products to defendant's site.  The court held that the district court did not err in finding that the defendant's infringement was willful and, therefore, did not abuse its discretion in determining that it was an "exceptional case" where an award of attorney's fees was appropriate.

In *Kiva Kitchen & Bath, Inc. v. Capital Distrib. Inc.*, 319 Fed.Appx. 316 (5th Cir. 2009), the Fifth Circuit upheld an award of attorney's fees where the defendant had registered internet domain names that incorporated eight trade names of plaintiff.  *Id.* at 318 n.1. With regard to the award of attorney's fees, the jury determined, and the district court agreed, that the case was "exceptional," in light of defendant's bad faith intent to divert potential plaintiff's customers to

defendant's website. *Id.* at 321. In *Victoria's Cyber Secret Limited Partnership v. Secret Catalogue, Inc.*, 161 F.Supp.2d 1339 (S.D.Fla. 2001), the court awarded attorney's fees to Victoria's Secret where the other party, a company engaged in the operation of adult websites, had registered four domain names similar to the mark of Victoria's Secret. The court concluded that the company acted in bad faith and that an award of attorney's fees was justified. *Id.* at 1352, 1356. The court stated that "the evidence and totality of circumstances are clear that VCS operated with bad faith intent to profit from VICTORIA'S SECRET mark." *Id* at 1352.

In *HER, Inc. v. RE/MAX First Choice, LLC*, 2009 WL 4730710 (S.D.Ohio Dec. 10, 2009), the court awarded fees upon a finding that the defendant registered certain domain names associated with plaintiff and its owners for the purpose of diverting internet users to the defendant's site. *Id.* at *3.

In *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F.Supp.2d 273 (S.D.N.Y. 2002), the court awarded fees where it found that the defendant had deliberately copied plaintiff's clothing products and committed perjury in deposition testimony regarding its copying of the products. Regarding the perjurious testimony, the court stated:

> At trial, [defendants'] principals denied that they had ever copied GTFM's garments and asserted that they had come up with the ideas for their own garments without referring to GTFM's garments . . . [F]or reasons described below, a comparison of the defendant's . . . jerseys with the plaintiffs' . . . jerseys shows that the defendant copied the plaintiffs' designs with meticulous attention to detail.

*Id.* at 297, n.7. Also, in *Polo Fashions, Inc. v. Magic Trimmings, Inc.*, 603 F.Supp. 13 (S.D.Fla. 1984), the court awarded fees where it found that the defendant intentionally copied the plaintiff's mark and denied doing so under oath.

Courts have also ruled that a willful infringement of a mark or willful copying of a product is sufficient to constitute an "exceptional case" justifying the award of attorney's fees. In *Horphag Research Ltd. v. Garcia,* 475 F.3d 1029 (9th Cir. 2007), the Ninth Circuit upheld the award of fees to a plaintiff where the defendant, who marketed an herbal supplement competitive with that of plaintiff's, took action to deliberately confuse the public into thinking that his product was that of plaintiff's. On his website promoting his product, defendant used "Pycnogenol," the trademark name for plaintiff's product, as a generic term for the French maritime pine tree supplements of the nature being sold by the two companies. Additionally, defendant attributed the results of research on plaintiff's product to that of defendant's, and altered quotations from scientific literature discussing plaintiff's product to make them appear as if they referred to defendant's product. *Id*. at 1033-34. In upholding the district court's award of attorney's fees, the court said: "[Defendant] made deliberate and calculated attempts to confuse [his] product with [Plaintiff's] Pycnogenol by altering quotations from research publications that refer exclusively to [plaintiff's] product. Accordingly, the district court did not abuse its discretion when it reinstated the award of attorney's fees to [plaintiff]." *Id.* at 1039.

Where a party's conduct is "willful and deliberate, the trial court may well determine that this is the type of 'exceptional case' for which an award of attorney's fees is appropriate." *West Des Moines State Bank v. Hawkeye Bancorporation*, 722 F.2d 411, 414-15 (8th Cir. 1983)(quoting *Metric & Multistandard Components Corp. v. Metric's, Inc.,* 635 F.2d 710, 716 (8th Cir. 1980). Here, the jury expressly found that B&B copied Hargis' fastener photos and size/weight charts and posted them on its website as its own, thus causing Hargis to prevail on its cross-complaint for false advertising and false designation of origin. The Court finds B&B's

10

conduct focusing on the creation of a new website as well as its contacting Hargis customers, using metatags and purchasing domain sites using the term "sealtite" or phrases containing that term, introducing bogus design drawings into evidence of purported construction fasteners, and other conduct previously discussed, was a willful and deliberate attempt to manufacture evidence to support its trademark infringement claim. The Court finds this is an exceptional case in which the award of fees is justified. The evidence is overwhelming that B&B engaged in efforts to manufacture the appearance of confusion, and began to formulate a theory of "reverse confusion," a position fundamentally inconsistent with B&B's longstanding theory of forward confusion.

Before the Court can determine whether the amount of fees requested is reasonable, Hargis must submit within fourteen (14) days from the date of entry of this Order an itemized statement of time spent and costs incurred, redacting any privileged information. B&B will be

allowed seven (7) days to respond to the statement.

## Conclusion

IT IS THEREFORE ORDERED that defendant's motion for attorney's fees [docket entry 211] is granted in part.  Hargis is directed to submit an itemized statement of time spent and costs incurred within fourteen (14) days from the date of entry of this Order.

DATED this 10th day of November, 2010.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE